## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| v. | * | Criminal No. RDB-19-0020 |
| PAUL ALEXANDER, | * | |
| *Defendant.* | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANT'S SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE, DERIVATIVE EVIDENCE

NOW COMES, Paul Alexander, Defendant, by and through undersigned counsel, pursuant to Fed. R. Crim. P. 12(b) and files this Supplemental Motion to Suppress and Reply, and, in support thereof, states as follows:

## INTRODUCTION

Defendant filed a Motion to Suppress the May 15, 2018 car stop and subsequent search and seizure on June 25, 2019. Therein, Defendant respectfully requested the opportunity to supplement the Motion to Suppress with any additional facts or evidence that may be discovered at a later date. Subsequent to June 25, 2019, the Government provided Defendant with discovery related to the May 15, 2018 traffic stops, as well as an additional traffic stop and search that occurred on April 26, 2018. The Government then provided additional discovery on August 14, 2019. On July 26, 2019, the Government filed a Consolidated Response in Opposition to Defendant's Motions to Suppress and Other Motions, which includes the Government's arguments in opposition to Defendant's Motion to Suppress the May 15, 2018 traffic stop. Based on the Government's Response and the additional discovery received after Defendant's initial filing, Defendant now files this Supplemental Motion to Suppress and Reply, and moves to suppress any

and all evidence stemming from (1) the April 26, 2018 traffic stops and search, (2) the May 15, 2018 traffic stops and subsequent search and seizure and (3) any fruits of the searches pursuant to warrants executed at 7787 Arundel Mills Blvd., Apt. #405 and a Honda Accord bearing Maryland Registration 6CDB86.

## FACTUAL BACKGROUND

In February 2018, the Drug Enforcement Administration ("DEA") met with and interviewed a confidential source ("CS-1").  CS-1 was shown pictures of potential targets and identified Omar Alexander, aka "Oatmeal," and his older brother, Defendant Paul Alexander.  CS-1 informed the DEA that Defendant supplies heroin to south Baltimore.  CS-1 also identified Samuel Price, aka "Mook," as a heroin supplier in the south Baltimore area and Rodney Jones, aka "Blaze," as a distributer for Defendant.   At the same time, the DEA was also investigating a suspected drug trafficker named Miles Bellamy.

**April 26, 2019 Surveillance, Traffic Stops and Search**

According to a DEA Report of Investigation prepared by Special Agent ("SA") Matthew L. Bryant and dated April 30, 2018, the DEA observed Bellamy enter into the parking lot adjacent to the Damon Renard Hair Studio located at 1306 Reisterstown Road, Pikesville Maryland, driving a Jeep Wrangler, at approximately 9:54 a.m. on April 26, 2018.  R-DEA6-0413.  SA Bryant observed Bellamy exiting and entering the Hair Studio.  *Id.*  SA Bryant reported that, at approximately 3:29 p.m., he observed a Mercedes-Benz E400 (PA K09198K) back into the parking spot next to Bellamy's Jeep Wrangler.  *Id.*  SA Bryant then observed the front passenger of the Mercedez-Benz, who was later identified as Defendant, exit the vehicle with a yellow bag in his right hand.  *Id.*  Bellamy then opened the driver's door of the Jeep Wrangler and "dipped underneath of the driver's seat and appeared to place an unknown object inside of the yellow bag."

*Id.* SA Byrant reported that, at approximately 3:31 p.m., Defendant entered into the Mercedes-Benz, immediately after which the vehicle left the parking lot.  *Id.*  DEA investigators conducted physical surveillance of the Mercedes-Benz, following the vehicle until Interstate 695 East, just prior to exit 16.  *Id.*

According to SA Bryant's Report, Baltimore County Police Officer Elder conducted a traffic stop on the Mercedes-Benz at approximately 3:45 p.m. after observing unauthorized window tinting and the failure to maintain a legible registration plate free from foreign materials. *Id.*  The body-worn camera ("BWC") footage of Officer Elder shows that the driver of the Mercedes-Benz identified himself to Officer Elder as Rodney Jones and provided his date of birth (April 6, 1976), Maryland driver's license and vehicle registration at approximately 3:46 p.m.. The front passenger, Defendant, also immediately identified himself as David Paul Hayes, but explained that his name was recently changed from Paul Alexander; Defendant also provided his date of birth (November 20, 1972).[1]  Officer Elder then returned to his vehicle at approximately 3:47 p.m. with Jones' driver's license, and stated over his radio "alright, you said you want a canine dog to come out?"  Officer Elder then re-approached the subject vehicle to confirm Defendant's identity at approximately 3:52 p.m., before returning to his own vehicle.  He again re-approached the subject vehicle at 3:55 p.m. to ask for Defendant's current address, returned to his patrol vehicle, and exchanged information over his radio regarding Defendant's identity. At 3:59 p.m., Officer Elder printed out a "Traffic Violation Warning" and sets it aside in his patrol vehicle. Officer Elder went back the subject vehicle once more to inquire about its VIN number at 4:01

---

[1] In its Consolidated Response, the Government points out that Defendant did not have any form of identification on him during the April 26, 2018 traffic stop.  Opposition at 3.  This is irrelevant to a traffic stop for illegal window tinting and failure to maintain a legible registration plate free from foreign materials where Defendant was the passenger of the vehicle stopped.

p.m. He apparently inquired into the VIN number for the next six minutes, until the canine officer arrives at the scene.

According to Officer Saladino, he was requested to respond to the April 26, 2019 traffic stop at 3:53 p.m., and arrived at 4:06 p.m. with his canine partner, K9 Bordi.  R-BCPD-0001. Officer Saladino and K9 Bordi then conducted a canine scan of the Mercedes-Benz.  *Id.*  According to Officer Saladino's report, K9 Bordi exhibited behaviors indicating the presence of the odor of a controlled dangerous substance ("CDS"), including a "passive sit" at the front of the vehicle.  *Id.* As a result of K9 Bordi's alert, Officer Elder then conducted a search of the Mercedes-Benz.  R-DEA6-0413.  During his search, Officer Elder located, but did not seize, a yellow Louis Vuitton bag containing an unknown amount of U.S. Currency in a vacuum-sealed bag labeled "3,000."  *Id.* Officer Elder completed his search of the vehicle at approximately 4:24 p.m.  At 4:26 p.m., Officer Elder reached into his patrol vehicle and handed Jones the "Traffic Violation Warning" he had generated at 3:59 p.m.  Soon thereafter, Jones and Defendant left the scene in the Mercedes-Benz.

### May 15, 2018 Traffic Stop and Subsequent Stop, Search and Seizure

According to a DEA Report of Investigation prepared by SA Bryant and dated May 18, 2018, investigators observed Bellamy park his Jeep Wrangler in the rear parking lot of the 1300 block of Reisterstown Road, Pikesville Maryland, adjacent to the Damon Renard Hair Studio, at approximately 3:14 p.m. on May 15, 2018.  R-DEA6-0418.   At approximately 3:22 p.m., Detective Kevin Fassl observed a white BMW (MD 89531CG) back into the parking space next to Bellamy's vehicle.  *Id.*  According to the report, Detective Fassl then observed Defendant exit the white BMW and stand next to the driver's door of Bellamy's Jeep Wrangler.  *Id.*  Detective Fassl then observed the driver's door of the Jeep Wrangler open, and then close at approximately 3:23 p.m.  *Id.*  Bellamy and Defendant stepped out of Detective Fassl's sight, toward the rear of

the vehicles. *Id.* Moments later, Detective Fassl saw both of the vehicles exit the parking lot. *Id.* Investigators immediately began conducting surveillance on the white BMW. *Id.*

At approximately 3:33 p.m., SA Bryant observed the white BMW parking in front of 4614 Debilen Circle, Pikesville, Maryland. *Id.* At 3:57 p.m., Task Force Officer ("TFO") Ethan Glover observed Jones walk from the direction of 4614 Debilen Circle and enter the front passenger door of the white BMW. *Id.* He then observed Defendant exit the same address and enter the white BMW through the driver's door; the BMW then exited the parking lot. *Id.* Between approximately 4:07 and 4:14 p.m., investigators observed the white BMW at an Exxon gas station located at 8029 Liberty Road, Baltimore, Maryland. *Id.* During that time, SA Brian High observed Defendant exit a Black BMW that had also pulled into the Exxon with a black bag in his hand, and place the black bag in the trunk of the White BMW. *Id.* TFO Glover also observed Defendant move a blue and black duffel bag from the back seat to the trunk of the White BMW. *Id.*

Between approximately 4:21 p.m. and 4:26 p.m., investigators observed the white BMW at a McDonald's located 6005 Liberty Road, Baltimore, Maryland. *Id.* During that time, TFO Glover observed Defendant meeting with an individual named Samuel Brown, also known as "Fat Sam," who had exited from a burgundy Range Rover (MD 1DC6032). *Id.* SA High also observed Defendant walking back from the Range Rover with a yellow bag. *Id.* After the White BMW exited the McDonald's, investigators continued to conduct vehicle surveillance for approximately fifteen more minutes. *Id.*

At approximately 4:40 p.m., Baltimore County Police officers conducted a traffic stop of the White BMW for alleged unauthorized window tinting on the 1600 block of Woodlawn Avenue, Woodlawn, Maryland. *Id.* The BWC footage of the Baltimore County Police Officers and Baltimore City Canine Officer present at the scene on May 15th shows the following:

5

- 4:41 p.m.[2]: Baltimore County Police Department ("BCPD") officer asks Defendant, who is driving the subject vehicle, and passenger, Rodney Jones, for identification. Defendant hands the officer Jones' driver's license. Defendant also hands the officer a "name change" document showing that he previously legally changed his name from "Paul Alexander" to "David Paul Hayes" and indicates that he does not have any other form of identification on him. The officer takes this documentation back to his vehicle.

- 4:49 p.m.: BCPD officer asks Defendant to step out of the vehicle; Defendant does so.

- 4:50 p.m.: Defendant informs BCPD officer that he previously had a driver's license under the name "Paul Alexander," and provides his date of birth (November 20, 1972). Defendant also informs officer of recent traffic stop, occurring in March 2018.

- 4:52 p.m.: BCPD officer asks Defendant to sit down on the curb; Defendant does so. While sitting in a police vehicle and operating a laptop therein, a *BCPD officer states that he found a "good picture" of David Paul Hayes*, and shows this picture to another BCPD officer. Around the same time, a BCPD officer asks Jones to exit the vehicle and sit on the curb next to Defendant.[3]

- 4:53 p.m.: BCPD officer states to another officer, "they're coming to do a scan, apparently it's supposed to be soon," "they got a city canine coming," and "*we're just waiting for canine to come, that's all*." The same BCPD officer repeatedly calls for canine over his radio, asking for "any canine, county-wide."

- 4:54 p.m.: While sitting in a police vehicle and operating a laptop therein, BCPD officer relays to another officer information he found related to the March 2018 traffic stop Defendant informed the officers of. *Officers determine that Defendant had a suspended license in March 2018.* Officer states "I'm convinced [Defendant] has no license so, if we need to, we can do that."

- 4:57 p.m.: BCPD officer states that, *when he searches for the name "David Paul Hayes," he gets a name, date of birth and address, and further states "with the name Hayes, your photo pops up, so we know it's you."*

- 4:59 p.m.: Jones explains to a BCPD officer that the subject vehicle is his, and that Defendant was just showing him how to drive it. At approximately the same time, a different BCPD officer communicates over his radio to a canine officer in Dundalk, Maryland, and gives the canine officer directions to the scene.

- 5:04 p.m.: BCPD officer tells another officer, who is sitting in a police vehicle, *"I got [Defendant's] information already. It comes back for the David Hayes dude."* The

---

[2] All times listed are based on the time stamps on each BWC video.
[3] According to the DEA6 Report related to the May 15, 2018 stop, at approximately 4:47 p.m., SA High observed Jones attempting to place a black bag in the rear of the vehicle. R-DEA6-0418.

officer sitting in the police vehicle then **searches on the laptop located therein for "Paul Alexander" and within 35 seconds, finds Defendant's driver's license information, including a photograph, name, date of birth and address.**

▪ 5:06 p.m.: BCPD officer states **"he's valid,"** after reviewing Defendant's driver's license information.

▪ 5:09 p.m.: Baltimore City Police canine officer Huter arrives at the scene with his canine, Gejza.

▪ 5:10 p.m.: Officer Huter walks canine Gejza to the driver's side of the subject vehicle. Officer Huter closes the driver's door. Officer Huter then walks Gejza counterclockwise around the vehicle, starting at the front of the vehicle. Canine Gejza cannot be seen when he walks past the trunk of the subject vehicle, but the canine's breathing does not audibly change and there are not other audible indications of an alert. When canine Gejza walks past the front passenger door, the canine makes a faint noise like it is coughing or panting heavily. At the conclusion of the scan, Officer Huter says that he does not know who is in charge and raises his left hand briefly, but does not speak to any of the BCPD officers or DEA agents present before putting canine Gejza back in his vehicle.

▪ 5:11 p.m.: Officer Huter has short conversation with a BCPD officer. Officer Huter does not mention any positive alert.

▪ 5:11 p.m.: BCPD officer turns his BWC back on after conclusion of canine scan.

▪ 5:12 p.m.: DEA agents conduct search of subject vehicle.

▪ 5:26 p.m.: DEA agent searches Defendant and Jones and seizes approximately $2,500 from Defendant's left pant pocket and an object from Defendant's right pant pocket that looks like keys.

▪ 5:29 p.m.: Officer Huter exchanges information with a DEA agent.

According to the K9 Search Sheet prepared by Officer Huter, K9 Gejza alerted to the presence of the odor of CDS at the trunk and passenger door of the vehicle at approximately 5:15 p.m.  R-K9-0002.  Officer Huter's BWC footage is the only video footage of the K9 scan and alleged alerts produced by the Government, and is described above.  Because of the angle of the camera, the video footage does not actually show K9 Gejza during the scan and alleged alerts.

Further, the K9 Search Sheet prepared by Officer Huter does not describe the manner in which K9 Gejza alerted.

As a result of the DEA's search of the subject vehicle, TO Glover seized U.S. Currency from the floorboard of the front passenger seat and the rear passenger seat and SA Bryant seized U.S. Currency from the trunk of the vehicle; the U.S. Currency seized totaled approximately $446,310.  DEA6-0418; *see also* R-DEA-6-0338.  Investigators also seized (1) a cable bill in the name of "Latina Skipwich," indicating a service address at The Residences at Arundel Preserve, located at 7789 Arundel Mills Boulevard, Apartment 47, Hanover, Maryland 21076; (2) a Cartier jewelry bill for $42,506 for Cierra Glover at 12401 Brickyard Boulevard, Beltsville, Maryland 20705; (3) three black phones; and (4) a blue and black bag.  R-DEA6-0415.

## ARGUMENT

This Honorable Court should suppress any evidence stemming from the April 26, 2018 and May 15, 2018 stops, as these stops and subsequent warrantless searches and seizure violated Defendant's Fourth Amendment rights.  Even assuming the validity of the initial traffic stops on April 26, 2018 and May 15, 2018, Baltimore County Police unconstitutionally extended the length of those stops in order for a canine officer and canine to arrive at the scene, rendering the subsequent detentions and warrantless searches unconstitutional.  Any evidence derived therefrom should be excluded, as it was obtained through the exploitation of Defendant's right to be free from unreasonable searches and seizures.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The Supreme Court has explained,

> The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative. The burden is on those seeking the exemption to show the need for it.

*Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971). In other words, it is the Government's burden to overcome the presumption of invalidity attached to a warrantless search.

In *United States v. Sharpe*, 470 U.S. 675 (1985), the Supreme Court made clear that a traffic stop involving a motorist is a detention which implicates the Fourth Amendment. 470 U.S. 675, 682 (1985); *see also Whren v. United States*, 517 U.S. 806, 809 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]."). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. "Probable cause has been defined as reasonable grounds for belief of guilt, supported by less than *prima facie* proof but more than mere suspicion." *United States v. One Parcel of Real Estate Located at 7715 Betsy Bruce Lane, Summerfield, N.C.*, 906 F.2d 110, 112 (4th Cir. 1990) (*citing United States v. 1982 Yukon Delta Houseboat*, 774 F.2d 1432, 1434 (9th Cir. 1985)).

However, even assuming police do have probable cause to believe that a traffic violation has occurred, the related traffic stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also United*

*States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) ("Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle *for as long as it takes to perform the traditional incidents of a routine traffic stop*." (emphasis added)). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Once the purpose of the stop is effectuated, the continued detention of the car and occupants constitutes a second detention. *Royer*, 460 U.S. at 500. This includes detentions continued while awaiting a canine officer. While a canine sniff is not a "search" within the meaning of the Fourth Amendment, an initially valid stop cannot be prolonged beyond the time necessary to effectuate its purpose in order to await the arrival of a canine officer. *See, e.g.*, *Branch*, 537 F.3d at 335 ("A canine sniff is . . . constitutionally acceptable *if performed within 'the time reasonably required' to issue a traffic citation*." (*quoting Caballes*, 543 U.S. at 408 (2005) (emphasis added)). The second detention effectuated by unreasonably prolonging the initial detention is also subject to Fourth Amendment scrutiny, and, is only constitutionally permissible if the driver consents thereto or the police have at least reasonable suspicion of criminal activity. *Branch*, 537 F.3d at 337.

**I.      The April 26, 2018 stops and subsequent search violated Defendant's Fourth Amendment right to be free from unreasonable searches and seizures, and any evidence stemming therefrom should be suppressed.**

According to the DEA Report of Investigation related to the April 26, 2018 traffic stop and the BWC footage of Baltimore County Police Officer Elder, Officer Elder effectuated the stop based on his observations of unauthorized window tinting and failure to maintain a legible registration plate free from foreign materials. Even assuming, *arguendo*, that this initial stop was valid, Officer Elder prolonged this stop longer than necessary to effectuate its stated purpose—

*i.e.*, to issue warning citations to the driver of the vehicle, Rodney Jones, for the abovementioned traffic violations. The assumedly valid initial detention, therefore, evolved into an invalid second detention, in violation of the Fourth Amendment. Any evidence derived from the subsequent search and seizure should therefore be suppressed.

After being pulled over at approximately 3:45 p.m., Jones, the driver of the subject vehicle, provided his Maryland driver's license to Officer Elder. Between 3:52 p.m. and 3:59 p.m., Officer Elder inquired into Defendant's identity, which, as the passenger of a vehicle being stopped for tint and legible registration plate violations, is wholly irrelevant. At 3:59 p.m., Officer Elder's BWC footage shows him holding the Traffic Violation Warning he ultimately issues to Jones. "[O]nce the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver 'must be allowed to proceed on his way.'" *Branch*, 537 F.3d at 336 (*quoting United States v. Rusher*, 966 F.2d 868, 876 (4th Cir. 1992)). Jones immediately demonstrated that he was entitled to operate the subject vehicle by presenting a valid driver's license and vehicle registration. Instead of issuing the Warning he generated, however, Officer Elder continued to perform unnecessary tasks for seven minutes until the canine officer arrived at the scene.

The vehicle detention clearly lasted "longer than . . . necessary to effectuate the purpose of the stop." *Royer*, 460 U.S. at 500. The continued detention of Defendant, therefore, constituted a second detention. *Id.* This second detention was not constitutionally permissible because (1) the driver, Jones, did not consent and (2) there is no basis for Officer Elder to have had reasonable suspicion of criminal activity. *Branch*, 537 F.3d at 337. Moreover, because the canine scan was not performed "within 'the time reasonably required' to issue a traffic citation" in this case, the scan is not constitutionally acceptable. *Branch*, 537 F.3d at 335 (*quoting Caballes*, 543 U.S. at

408).  Without the canine scan and subsequent positive alert to the presence of the odor of CDS, Officer Elder would have had no probable cause to search the subject vehicle.  Consequently, any evidence derived from that search should be suppressed.

**II.    The May 15, 2018 stops and subsequent search violated Defendant's Fourth Amendment right to be free from unreasonable searches and seizures, and any evidence stemming therefrom should be suppressed.**

Even assuming, *arguendo*, that the initial stop made on May 15, 2018 was valid, BCPD prolonged this stop longer than necessary to effectuate its stated purpose—*i.e.*, to issue warning citations

for unauthorized window tinting.  The assumedly valid initial detention, therefore, evolved into an invalid second detention, in violation of the Fourth Amendment.  Any evidence derived from the subsequent search and seizure should therefore be suppressed.  Even assuming, *arguendo*, that the prolonged detention was not constitutionally invalid, there was no probable cause to search the subject vehicle.  Finally, even assuming, *arguendo*, that there was probable cause to search the subject vehicle, the documents seized by the DEA were beyond the scope of that probable cause.

**A.    The second detention of the White BMW was constitutionally invalid.**

According to the DEA Report of Investigation related to the May 15, 2018 traffic stop and the BWC footage of Baltimore County Police officers, BCPD effectuated the stop of the White BMW based on observations of unauthorized window tinting.  Even assuming, *arguendo*, that this initial stop was valid, BCPD prolonged this stop longer than necessary to effectuate its stated purpose—*i.e.*, to issue warning citations for the aforementioned traffic violation.  The assumedly valid initial detention, therefore, evolved into an invalid second detention, in violation of the Fourth Amendment.

Following approximately 80 minutes of DEA surveillance of Defendant and Rodney Jones in a White BMW with Maryland registration 89531CG on May 15, 2018, BCPD conducted a traffic stop of the vehicle at approximately 4:40 p.m.   A BCPD officer asked the driver of the vehicle, Defendant, and the passenger, Rodney Jones, for identification.   Defendant explained that he did not have a driver's license in his possession, but provided the officer with a legal name change document, which contained his legal name and date of birth.   This document showed that Defendant had previously legally changed his name from "Paul Alexander" to "David Paul Hayes."   Defendant also explained that he had recently been pulled over for a separate traffic violation, in March of 2018.

In its Opposition to Defendant's Motion to Suppress, the Government states that "[o]fficers were unable to definitively locate information to positively identify the Defendant."   Opposition at 21.   First, BCPD officers conducted the traffic stop of the White BMW directly following the DEA's physical surveillance of Defendant and Jones in the same vehicle.   Second, even assuming for the sake of argument that the DEA did not communicate Defendant's identify to the BCPD, the BWC footage shows that officers were, in fact, able to identify Defendant on multiple occasions:

At approximately 4:52 p.m., a BCPD officer stated that found a "good picture" of David Paul Hayes, and showed this photograph to another BCPD officer.

At 4:54 p.m., one BCPD officer relayed to another officer information he found related to the March 2018 traffic stop Defendant had informed the police of.   The officers then determined that Defendant had a suspended license in March 2018.

13

At 4:57 p.m., a BCPD officer stated to Defendant that, when he searched for the name "David Paul Hayes," he got a name, date of birth and address, and then further stated "with the name Hayes, your photo pops up, *so we know it's you*."

At 5:04 p.m., one BCPD officer approached another and stated, "***I got [Defendant's] information already.  It comes back for the David Hayes dude.***"  At this point, the other officer then searched on the laptop located in the patrol vehicle he was sitting in for "Paul Alexander."  Within ***35 seconds***, that officer found Defendant's driver's license information, including a photograph, name, date of birth and address.

At 5:06 p.m., after reviewing the information related to Defendant's driver's license, a BCPD officer states "he's valid," in reference to Defendant.

The BWC footage demonstrates that, as early as 4:52 p.m., *seventeen minutes* before the canine officer arrived, BCPD identified Defendant.  This conclusion is further supported by the statement of a BCPD officer made one minute later, at 4:53 p.m.: "we're just waiting for canine to come, ***that's all***."  That canine officer did not arrive until 5:09 p.m.

The Government also argues that officers "determined that, based on the information available to them, neither "Paul Alexander, Jr." nor "David Paul Hayes" held a valid license to operate a motor vehicle," and that the initial stop had therefore not concluded.  Opposition at 21-22.  As indicated above, BCPD officers made this determination at 4:54 p.m.  At that time, one of the officers stated, "I'm convinced [Defendant] has no license so, if we need to, we can do that."  Assuming the "purpose of the stop" shifted at this point from investigating unauthorized window tinting to driving without a license, BCPD could have arrested Defendant for violating Maryland's Transportation Code in order to "effectuate" this new purpose.  *Royer*, 460 U.S. at 500.  This is especially so considering the fact that Jones, who did have a valid driver's license at the time,

informed the officers that the vehicle belonged to him.  Instead, however, the officers continued

to make needless inquiries into Defendant's identity until a canine officer arrived at the scene at

approximately 5:09 p.m., prolonging the stop beyond the time necessary to effectuate its purpose.

The vehicle detention clearly lasted "longer than . . . necessary to effectuate the purpose of

the stop."  *Id.*  The continued detention of Defendant, therefore, constituted a second detention.

*Id.* This second detention was not constitutionally permissible because (1) the driver, Defendant,

did not consent and (2) there is no basis for BCPD officers to have had reasonable suspicion of

criminal activity to justify extension of the initial stop.  *Branch*, 537 F.3d at 337. Moreover,

because the canine scan was not performed "within 'the time reasonably required' to issue a traffic

citation" in this case, the scan is not constitutionally acceptable.  *Branch*, 537 F.3d at 335 (*quoting*

*Caballes*, 543 U.S. at 408).  Without the canine scan and subsequent positive alert to the presence

of the odor of CDS, the DEA would have had no probable cause to search the subject vehicle.

Consequently, any evidence derived from that search should be suppressed.

**B.      Law enforcement lacked probable cause to search the subject vehicle.**

After the BCPD prolonged the May 15, 2018 stop to await the arrival of a canine officer,

the canine allegedly alerted to the presence of the odor of CDS at the trunk and front passenger

door of the White BMW.  DEA agents then conducted a search of the vehicle.  The only video

footage of the canine scan does not clearly indicate any alert.  Moreover, there is zero indication

that the canine officer, Officer Huter, communicated that his canine alerted to any of the BCPD

officers or DEA agents present at the scene.  Without a positive canine alert, law enforcement had

no probable cause to search the subject vehicle, and any evidence derived from that search should

be suppressed.

When a search is conducted without a warrant, it is the Government's burden to overcome the presumption of invalidity attached thereto. *See Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971). "[I]t is well settled that a 'positive alert' from a drug detection dog, in and of itself, provides probable cause to search a vehicle." *Branch*, 537 F.3d 328, 340 n.2 (4th Cir. 2008). However, the Government has not satisfied its burden of proving that there was a "positive alert" on May 15, 2018.

Officer Huter's BWC footage is the only video footage of the K9 scan and alleged alerts produced by the Government. Because of the angle of the camera, the video footage does not actually show K9 Gejza during the scan and alleged alerts. Canine Gejza therefore cannot be seen when he walks past the trunk of the subject vehicle, but the canine's breathing does not audibly change and there are no other audible indications of an alert. When canine Gejza walks past the front passenger door, the canine makes a noise like it is coughing or panting heavily. At the conclusion of the scan, Officer Huter says that he does not know who is in charge and raises his left hand briefly, but does not speak to any of the BCPD officers or DEA agents present before putting canine Gejza back in his vehicle. Further, the K9 Search Sheet prepared by Officer Huter is very minimal and does not describe the manner in which K9 Gejza alerted.

The warrantless search of the vehicle on May 15, 2018 is presumptively invalid and the Government has not met its burden of overcoming this presumption. Suppression of any evidence derived from this warrantless search is appropriate.

**C.       The items seized by law enforcement had no nexus to criminal activity.**

Finally, even assuming *arguendo* that probable cause did exist to search the White BMW, two of the items seized from the vehicle have no nexus to criminal behavior. Their seizure was therefore unconstitutional and this evidence, along with evidence derived therefrom, should be

suppressed. DEA agents seized from the vehicle a cable bill in the name of "Latina Skipwich" with an address of 7789 Arundel Mills Boulevard, Apartment 47, Hanover, Maryland 21076 and a Cartier jewelry bill for $42,506 for Cierra Glover at 12401 Brickyard Boulevard, Belstville, Maryland 20705. "The requirements of the Fourth Amendment can secure the same protection of privacy whether the search is for 'mere evidence' or for fruits, instrumentalities or contraband. There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967); *see also Garcia v. Montgomery County, Maryland*, 145 F.Supp.3d 492, 522 (D.Md. 2015) ("Even then, the items could only be seized if there is a 'nexus ... between the item to be seized and criminal behavior.'"). There is simply no nexus between a cable bill or a jewelry bill, both in the names of someone other than Defendant or Jones, and the criminal behavior suspected based on the positive canine alert. This evidence, and all other evidence derived from this evidence, should be suppressed.

**III.     The evidence from Apartment 405 and vehicle should be suppressed because the issuing Magistrate did not have a substantial basis to issue the warrant and no reasonable officer would have relied upon the warrant.**

"When issuing a warrant and making a probable cause determination, judges are to use a totality of the circumstances analysis." *United States v. Grossman*, 400 F.3d 212 (4th Cir. 2005). "A magistrate presented with a search warrant application must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit … there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Lalor*, 996 F.2d 1578, 1580 (4th Cir. 1993), *cert. denied Lalor v. United States*, 510 U.S. 983 (1993). "Sufficient information must be presented to the magistrate to allow for the exercise of independent judgment; the magistrate cannot simply ratify the conclusions of others." *Id.* at 1581.

The correct inquiry that a reviewing court must make is whether the magistrate had a substantial basis for determining whether probable cause existed in a given case to justify the issuance of a search warrant.  *Id.*

"In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, ***but whether it is reasonable to believe that the items to be seized will be found in the place to be searched*.**"  *Id.* at 1582 (emphasis supplied).  "[T]he nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence."  *Id.*   If there is no mention in a search warrant affidavit of  "circumstances that indicate [illegal narcotics] evidence was likely to be stored at [a defendant's] address," then there is no substantial basis for a magistrate to issue a search warrant.  *Id.* at 1582-83.

Defendant recognizes that, in *Grossman*, the Fourth Circuit held that inferences can support probable cause.  *Grossman*, 400 F.3d at 217.  However, in Defendant's case, under the totality of the circumstances, no *reasonable* inference can support the conclusion that illegal narcotics would be found at the locations of the warrant executions.  As the Fourth Circuit recognized in *Lalor*, "[w]here no evidence connects the drug activity to the residence, the courts have found the warrant defective."  *Lalor*, 996 F.2d at 1583.  "Accordingly …. The search will be insulated only if an exception to the warrant requirement applies."  Id.

### A.    The affidavit for The Arundel Apartment Complex, 7787 Arundel Mills Blvd., Apt. 405, Hanover, Maryland 21076 fails to establish any nexus between Alexander, his suspected illegal activities and Apt. 405.

The affidavit in support of the search warrant for 7787 Arundel Mills Blvd., Apartment 405, fails to establish a sufficient nexus between Alexander, his suspected illegal activities and the

apartment.  The affidavit provides that on December 21, 2018, DEA agents reviewed security

footage at this location from December 18, 2018.  (SW08-0038 at para. 60).  The affidavit states,

> Based on The Arundel security cameras, investigators observed ALEXANDER
> turn down the fourth floor hallway of The Arundel and entered a room at the end
> of the hallway by himself with the aforementioned Chick-Fil-A restaurant bag and
> a black backpack.  Investigators visited the area on the fourth floor where
> ALEXANDER was observed entering an apartment.  Based on the area where
> ALEXANDER is *believed* to enter an apartment, investigators *believe*
> ALEXANDER entered apartment #405."

(SW08-0038 at para. 61 & 62) (emphasis supplied).

This ambiguous "guess" that Defendant was *believed* to enter an apartment, and follow-on

"guess" that investigators *believed* that apartment to be #405 is the entirety of nexus between

Alexander, his suspected illegal activities, and this apartment.[4]  During the totality of the

approximately 8-month long investigation with an enormous amount of surveillance of Defendant,

investigators *believed* Alexander entered apartment #405 once with a Chick-Fil-A bag and a

backpack.  This is entirely insufficient to create a "a fair probability that contraband or evidence

of a crime will be found" in Apartment #405.  *Lalor*, 996 F.2d at 1580.

Defendant's case is similar to *United States v. Holt*, 196 Fed.Appx. 213 (4th Cir. 2006).  In

Holt, the Fourth Circuit, in affirming the suppression of evidence, adopted the U.S. District Court

for the Western District of North Carolina's rationale regarding a lack of nexus in the warrant

application.  The Court observed,

> There is no indication in the affidavit that the defendant Big Al resides at the
> premises or has ever been on the premises prior to this single occasion.  There is no
> indication that Big Al owns, or pays rent, or is an invited guest at 235 Kingville
> Drive.
>
> *       *       *

---

[4] The canine scan in the hallway that allegedly resulted in a "hit" on December 28, 2018 does
nothing to bolster the nexus between Alexander and Apartment #405.  (*See* SW08-0038 at para.
63).

> In short, there is no information that links ongoing or future drug activity to this home, and thus there is no indication that search of the home would yield any evidence of drug activity."

*Id.* at 215.

The *Holt* Court went on to explain that the *Leon* good faith exception did not apply in this circumstance explaining,

> Any officer who had experience and training should have known that Officer Greene's affidavit, which is the only information the magistrate had, provided no indicia of probable cause to believe contraband would be found at 235 Kingville Drive. From an objective standpoint, the court suggested, any reasonably well-trained officer – especially one with Officer Greene's training and experience – would have known that the search was illegal despite the magistrate's authorization.

*Id.* at 215-16.

In Defendant Alexander's case, the *belief* that Alexander entered an apartment, and the *belief* that it was Apartment # 405 provided "no indicia of probable cause to believe contraband would be found" there. *Id.* Like in *Holt*, there is no evidence that Defendant Alexander resided at Apt. #405, or, has ever been in the premises other than the single occasion where investigators *believed* he was there. There is also no evidence that Defendant Alexander pays rent, has utility bills in his name, or receives mail at this premises. Even assuming, *arguendo*, that investigators were correct as to Defendant entering the premises on one occasion, there is no evidence he did anything other than eat Chick-Fil-A at this premises.

For the foregoing reasons, Defendant moves to suppress the evidence and any derivative evidence recovered as a result of the search of 7787 Arundel Mills Blvd, Apt. #405.

**B.    The evidence recovered from the 2008 Honda Accord, Maryland License Plate 6CDB86, should be suppressed because the issuing Magistrate did not have a substantial basis to issue the warrant and no reasonable officer would have relied upon the warrant. Any probable cause that may have existed for this vehicle was stale at the time the Magistrate issued the warrant.**

The Fourth Circuit Court of Appeals has previously held,

> The Fourth Amendment bars search warrants issued on less than probable cause, and there is no question that time is a crucial element of probable cause. A valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case … Consequently, evidence seized pursuant to a warrant supported by stale probable cause is not admissible in a criminal trial to establish the defendant's guilt.

United States v. McCall, 740 F.2d 1331, 1335-36 (4th Cir. 1984) (internal quotations omitted) (internal citations omitted). The Fourth Circuit went on to hold that "[t]his question is not resolved by reference to pat formulas or simple rule … [r]ather, we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized." McCall, 740 F.2d at 1336.

The affidavit in support of the search warrant -- issued on January 3, 2019 -- for the Honda Accord provides that observations were made on this vehicle on June 19, 2018 and December 11, 2018. (SW9-0045). The observations included Defendant placing bags into and removing bags from the trunk. (SW9-0045 at para 70 & 72). On the June 19, 2018 observation, investigators saw what they believed were rectangular-shaped objects being removed from one of the bags. Investigators conducted canine scans and had alleged alerts on July 11, 2018 and December 28, 2018. (SW9-0046 at para.71 & 73). No confirmation was made on these dates whether the vehicle actually contained narcotics.

Any observations from the summer of 2018 that Defendant Alexander allegedly placed bags into the vehicle or removed bags from the vehicle do not support that there was probable cause in January 2019 to search these vehicles. Additionally, a canine scan on a vehicle almost a week prior in December does not support probable cause for a warrant in January.

Good faith is not a safe-harbor which can cure the constitutional infirmity in this case. The first reason is that subjective good faith is not enough to fall under <u>Leon</u>. <u>See Leon</u>, 468 U.S. at 915. Objectively, no reasonable officer would rely on a search warrant issued by a court based on stale information as included in the warrant in this case.

## CONCLUSION

It is for the above-stated reasons, as well as those outlined in Defendant's original Motion to Suppress that this Honorable Court should suppress the evidence and derivative evidence from the traffic stops and warrants detailed herein.

Respectfully submitted,

_____/s/_____
Russell A. Neverdon, Sr.
Law Office of Russell A. Neverdon, Sr., LLC
711 St. Paul Street, Ground Floor
Baltimore, Maryland 21202
(410) 235-2184 Office
(410) 235-4000 Facsimile
ransr@neverdonlaw.com
Federal ID#25949